# In the United States Court of Federal Claims

No. 10-731T

(Filed: March 20, 2013)

_____

| | |
|---|---|
| ROBERT F. GOELLER and<br>JEANETTE M. GOELLER,<br><br>                      Plaintiffs,<br><br>    v.<br><br>THE UNITED STATES,<br><br>                 Defendant. | *   Tax refund suit; Cross-motions for summary<br>*   judgment under RCFC 56; Deductibility of<br>*   "theft" loss under I.R.C. § 165(c)(3);<br>*   Definition of "theft;" *Edwards*; Reliance upon<br>*   state law definitions of crimes contrary to<br>*   normal rules for interpreting Federal tax<br>*   statutes; *Burnet v. Harmel*; Anomalous results<br>*   produced by incorporating state criminal law<br>*   into Federal taxing statute; Common law<br>*   definition of "theft" established; Questions of<br>*   facts as to allowance and amount of<br>*   deduction; Trial.<br>* |

_____

**OPINION**

_____

*Michael P. Marsalese,* The Marsalese Law Group, PLLC, Southfield, MI, for plaintiffs.

*Gregory S. Knapp,* Tax Division, United States Depart of Justice, with whom was Assistant Attorney General *Kathryn Keneally*, for defendant.

**ALLEGRA, Judge:**

In this tax refund suit, plaintiffs, Robert F. Goeller and Jeanette M. Goeller (the Goellers), claim a deduction under section 165(c)(3) of the Code[1] for their 2004 taxable year. They assert that officials of Complete Property Resources (CPR), a real estate business, misappropriated funds that they had invested in that firm, thereby causing a "theft" loss. Based on this alleged loss, plaintiffs also seek refunds for 2001, 2002, and 2003, due to loss carrybacks under section 172 of the Code.

_____

[1] All references herein are to the Internal Revenue Code of 1986 (26 U.S.C.), unless otherwise indicated.

**I.**

CPR was the trade name for several Columbus, Ohio-based companies engaged in the business of buying and selling residential real estate from 1992 through at least 2004.  CPR was financed by private investment; it issued promissory notes to private lenders that were secured by mortgages on CPR properties.  CPR also offered "tandem investments," whereby an investor "purchased" a CPR property by making a capital contribution to CPR of 20 percent of the purchase price and taking out a loan for the remainder.  CPR then paid the investor interest on both the loan and the capital contribution.  In the course of its business, CPR regularly sold the property that secured a given promissory note, obtaining, for that purpose, a release from the affected investors.  CPR sometimes obtained multiple mortgages on a single property; in some cases, investors, including plaintiffs, agreed to have a promissory note secured by a future, not yet acquired, CPR property.  As a result of these practices, the CPR property associated with any given promissory note intermittently changed, as was reflected on financial statements sent to investors.

Plaintiffs began investing in CPR in 1995, after meeting with CPR president, Steve Vilardo (Vilardo).  Plaintiffs participated in several promissory note and tandem investments offered by CPR.  The terms of these investments were usually negotiated between Robert Goeller and Vilardo, typically over the phone.  At times, plaintiffs agreed to alter the security for their promissory notes in the fashion described above.  In 1998, plaintiffs moved from Columbus, Ohio, to Santa Rosa, California, where they have resided since; after moving to California, plaintiffs continued to invest in CPR, investing in the three properties at issue here – 545 Elberne Ave. (Elberne); 810 Coral Tree Ct. (Coral); and 4516 White Leaf Way (White Leaf) – between July 2003 and February 2004.

From 1995 to 2004, plaintiffs wrote twelve checks to CPR, making investments totaling $769,542.  While seven of those checks can be traced to particular promissory notes, the remaining five – totaling $133,542 – cannot.  Additionally, plaintiffs invested approximately $48,000 in CPR tandem investments and $91,420 in Individual Retirement Account (IRA) funds held in CPR accounts.  Between 1995 and 2004, plaintiffs received regular payments of interest and returns of principal from CPR.  Plaintiffs, however, cannot substantiate how much they actually received during this period.

In July 2004, plaintiffs phoned Vilardo, requesting a $260,000 return of investment capital.  Vilardo agreed, noting that a CPR investment associated with plaintiffs' Elberne note was due to close soon, and that the proceeds from that could be used to satisfy partially plaintiffs' request.[2]  Plaintiffs anticipated that two other properties associated with their

---

[2]  While the parties now dispute whether certain investments were tied to particular properties, it appears that plaintiffs and CPR did not tend to view the former's investments and the properties securing them as static – when plaintiffs requested a capital return in 2004, for example, they anticipated that those funds might come from a variety of sources, including general CPR funds not tied to the sale of a specific property.

promissory note investments – Coral and White Leaf – might be liquidated or remortgaged to satisfy their request.  Prior to this time, plaintiffs' requests for returns of capital had always been honored by CPR, albeit sometimes slightly delayed.  But, in this case, the requested $260,000 return was not forthcoming.

Later – toward the end of 2004 – plaintiffs were chagrined to learn that the Elberne property had been sold.  They began to speak with Teresa Klaus, wife of CPR Vice President and Secretary Fred Klaus, in an effort to determine not only why they had not received payment from CPR, but also why certain properties previously listed on their financial statements were no longer available as security.  In subsequent conversations with Vilardo in 2004, plaintiffs determined that three properties – Elberne, Coral, and White Leaf – were no longer available as security and that CPR had not recorded plaintiffs' mortgages on these properties.[3]  Though the parties dispute what transpired next, as 2004 ground to a close, plaintiffs continued to speak with Theresa Klaus and Vilardo, seeking to obtain further information and repeatedly requesting the $260,000 return of capital.  Around November 2004, CPR determined that it could no longer honor its obligations to private investors, and, in December 2004, it defaulted on its investment obligations.  On December 23, 2004, plaintiffs sent Vilardo an email containing wiring instructions for transferring the requested $260,000 return of capital.[4]

In early 2005, a committee of CPR creditors was formed to keep its investors informed of the company's financial situation and the status of their investments.  Shortly after it was formed, this committee began sending correspondence to investors and holding meetings.  Plaintiffs participated in some meetings by phone.  At about the same time, CPR began sending letters to investors explaining its restructuring efforts.  For example, in a letter dated January 28, 2005, CPR described a restructuring program under which it would reduce interest rates on private investments and temporarily withhold payments to investors.  In a letter dated April 8, 2005, CPR outlined a proposal under which unsecured investments would be converted to equity in CPR, while the terms of secured investments would remain unchanged but with a lower rate of return.  In response to this letter, on April 25, 2005, plaintiffs informed Fred Klaus that they needed more information about their investments, including the extent to which they were secured, before they could agree to CPR's proposed restructuring plan.

During the restructuring process following CPR's default, plaintiffs received additional returns of principal and interest on their tandem investments and certain promissory notes.  As to the former, plaintiffs received a return of capital on all but one investment.  With regard to their promissory note investments, plaintiffs received post-default returns of capital as secured properties were sold, but nothing on their unsecured investments.

---

[3]  In his deposition, Vilardo admitted that he had represented to plaintiffs that the mortgage for the Elberne property would be recorded and does not know why it was not recorded.

[4]  In January 2005, Vilardo sent two letters to plaintiffs regarding a loan CPR was working to secure, which Vilardo said could be used to satisfy plaintiffs' capital request.

Despite its restructuring efforts, by a letter dated December 5, 2005, CPR informed investors that it intended to file a prepackaged reorganization plan under Chapter 11 of the bankruptcy code, 11 U.S.C. § 1101, *et. seq.*[5]  Pursuant to the plan, CPR proposed making the current unsecured creditors the equity owners of the company.  Enclosed with the letter was a ballot that creditors could use to vote on the plan.  Plaintiffs, among 90 percent of CPR's investors, voted to accept CPR's proposed bankruptcy reorganization plan.

On August 15, 2006, CPR and its affiliated entities filed voluntary Chapter 11 bankruptcy petitions in the U.S. Bankruptcy Court for the Southern District of Ohio.  The claim schedules filed by CPR included secured claims for at least five of plaintiffs' tandem and promissory note investments, but did not include the Elberne, Coral, or White Leaf properties.  On September 11, 2006, plaintiffs filed an unsecured proof of claim in CPR's bankruptcy case for $708,000.  Despite Vilardo's periodic expressions of regret and claims that he was personally obligated to CPR's investors, plaintiffs ultimately recovered nothing on this latter claim.  (As part of the restructuring process, Vilardo lost both his home and farm, which were pledged as collateral for CPR investments.)

In early 2006, Plaintiffs hired Tobias Elsass of the Fraud Recovery Group, which also represents other CPR investors, to prepare a federal tax refund claim based on plaintiffs' CPR losses.  On or about March 3, 2006, plaintiffs filed a Form 1040X amended tax return for 2004, which claimed a theft loss of $417,819 for that year under section 165(c), and a refund of $2,407.[6]  Plaintiffs also submitted a Form 1045, Application for Tentative Refund, on which they claimed carrybacks of the 2004 net operating loss resulting from the claimed section 165(c) deduction to years 2001 through 2003.  The carryback refunds requested amount to $3,994 for 2001, $32,662 for 2002, and $19,286 for 2003.

During the examination of plaintiffs' claim, Elsass sent the Internal Revenue Service (IRS) a letter, dated October 3, 2007, explaining that in CPR's bankruptcy, plaintiffs realized an unsecured loss of $708,000, of which $300,690 was IRA funds, leaving a "theft" loss of

---

[5]  "A 'prepackaged' Chapter 11 plan is one which is negotiated and accepted by the parties prior to the filing of a Chapter 11 case, but which is approved and confirmed by the court in a subsequently filed Chapter 11 case."  5 William L. Norton, Jr. Norton Bankr. L. & Prac. 3d § 97:1 (2013); *see also United Artists Theatre Co. v. Walton*, 315 F.3d 217, 224 n.5 (3d Cir. 2003); *In re Pioneer Fin. Corp.*, 246 B.R. 626, 630 (Bankr. D. Nev. 2000).

[6]  While plaintiffs' tax refund claim was pending, the Ohio Department of Commerce, Division of Securities, conducted an investigation into the activities of Vilardo, Fred Klaus, and CPR.  On January 24, 2007, the Division of Securities issued a cease and desist order finding that CPR sold certain tandem investments and unsecured promissory notes in violation of Ohio law governing the registration of "securities."  The order, however, did not assert that these activities violated Ohio securities laws prohibiting acts of fraud or deceit in connection with the sale of a security.

$407,310.[7]  On November 19, 2007, the IRS denied plaintiffs' refund claim.  On November 5, 2008, the IRS Appeals Office issued plaintiffs a notice of disallowance, stating that "[d]ue to changes to the December 31, 2004 tax year there is no net operating loss in 2004 and there is no amount to be carried back to the years ended December 31, 2001, December 31, 2002 and December 31, 2003."  On October 28, 2010, plaintiffs instituted this action.  Following discovery, on January 27, 2012, defendant filed its motion for summary judgment, and, on March 14, 2012, plaintiffs filed their cross-motion for summary judgment.  Following the completion of briefing on these motions, the court held oral argument.

## II.

We begin with common ground.  Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment.  *Id.* at 248.  However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."  *Id.*; *see also Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When making a summary judgment determination, the court is not to weigh the evidence, but to "determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("a [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004).  The court must determine whether the evidence presents a disagreement sufficient to require fact finding, or, conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson*, 477 U.S. at 251-52; *see also Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" (quoting *Matsushita*, 475 U.S. at 587)).  Where there is a genuine dispute, all facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion.  *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Stovall v. United States*, 94 Fed. Cl. 336, 344 (2010); *L.P. Consulting Grp., Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).  Where, as here, a court considers cross-motions for summary judgment, it must view each motion, separately, through this prism.[8]

---

[7]  Plaintiffs do not explain the discrepancy between the $417,819 figure referenced in their March 2006 amended tax return, and the $407,310 figure referenced in the October 2007 letter (which reflected a figure that was submitted in connection with CPR's August 2006 bankruptcy).

[8]  *See Chevron U.S.A. Inc. v. Mobil Producing Tex. & N.M.*, 281 F.3d 1249, 1253 (Fed. Cir. 2002); *see also Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010); *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010);

## A.

The Goellers argue that their involvement with CPR resulted in theft losses that were deductible on their 2004 return.[9]  Section 165(a) of the Code allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise."  26 U.S.C. § 165(a).  Cabining this loss deduction, section 165(c)(3) states that "[i]n the case of an individual, the deduction under subsection (a) shall be limited to— . . . losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft."  *Id.* at § 165(c)(3); *see also Maher v. Comm'r of Internal Revenue*, 680 F.2d 91, 91 (11th Cir. 1982); *Ambrose v. United States*, 106 Fed. Cl. 152, 156 (2012).[10]  In order to qualify for a loss deduction, a taxpayer must be able to prove the existence and amount of the claimed loss.  *Boehm v. Comm'r of Internal Revenue*, 326 U.S. 287, 294 (1945); *Stivers v. Comm'r of Internal Revenue*, 360 F.2d 35, 40 (6th Cir. 1966).

Both parties cite authority for the proposition that whether a "theft" has occurred, for purposes of section 165(c)(3) of the Code, depends upon whether a theft has occurred under state law.  However, they dispute whether the controlling law is that of Ohio (where CPR was based) or in California (where the Goellers were located).   To resolve that issue, the parties would have the court apply concepts akin to those used to resolve conflicts of law, to determine where the loss was "sustained."  *Cf. Weingarten v. Comm'r of Internal Revenue*, 38 T.C. 75, 78-79 (1962).  Within the various state law regimes, the parties also dispute which criminal statutes are controlling, and whether the requisite elements of a given theft crime (*e.g.*, theft by false pretenses) have been satisfied.  They further disagree as to when plaintiffs discovered any theft here, whether they had a reasonable chance to recover their losses in 2004, and the amount of any loss, if at all, that is deductible.

---

*Stovall*, 94 Fed. Cl. at 344; *Northrop Grumman Computing Sys., Inc. v. United States*, 93 Fed. Cl. 144, 148 (2010).

[9]  The Goellers also argue that they were entitled to carry back some of the losses to earlier tax years.  They agree, though, that if they were not entitled to deduct the losses in 2004, then they are ineligible for these carryovers.

[10]  The deduction for losses has one of the oldest lineages of any provision in the Code.  The first section authorizing such a deduction was included in the Revenue Act of 1867, which allowed as a deduction "losses actually sustained during the year arising from fires, shipwreck, or incurred in trade."  Revenue Act of 1867, ch. 169, § 13, 14 Stat. 471, 477 (1967).  That Act famously was declared unconstitutional in *Pollock v. Farmers' Loan & Trust Co.*, 157 U.S 429 (1895), leading to the passage of the Sixteenth Amendment.  Following that amendment, language similar to the current section 165(c) was added to the statute in the Revenue Act of 1916, ch. 463, § 5(a)(4), 39 Stat. 756 (1916).  *See* John Seidman, Seidman's Legislative History of the Federal Income Tax Laws (1938-1861) 962-63 (1938); *see also Ambrose*, 106 Fed. Cl. at 156 n.5.

Under the Treasury Regulations interpreting section 165, the term "theft" is "deemed to include, but shall not necessarily be limited to, larceny, embezzlement, and robbery." Treas. Reg. (26 C.F.R.) § 1.165-8(d); *see also Schroerlucke v. United States*, 100 Fed. Cl. 584, 596 (2011). The regulations, however, stop there in terms of providing any further guidance on how to determine whether particular conduct amounts to "theft" or any one of these other enumerated crimes. Like the parties here, many cases seek further guidance on this point from state law, often citing *Edwards v. Bromberg*, 232 F.2d 107, 111 (5th Cir. 1956), for the proposition that "whether a loss from theft occurs within the purview of [section 165(c)(3)] . . . depends upon the law of the jurisdiction where it was sustained." From this point, many courts embark on an extended analysis of whether the actions that occasioned the loss of funds constituted one of the requisite theft crimes under state criminal laws.[11] Neither *Edwards* nor any of its progeny, however, explain why state law should control the definition of what is a "theft" – most opinions are satisfied to treat the sentence from *Edwards* quoted above as axiomatic. As such, none of them begin to explain why Congress would want state-by-state variability in the treatment of theft losses for Federal income tax purposes, particularly via a provision in which all the other triggering events for deductible losses – fire, storm, shipwreck, or casualty – are defined not by state law, but by reference to their plain meanings.[12]

While the court is hesitant to replow a field that has been so extensively cultivated, it is obliged to do so, as none of the precedents adopting state law are binding here. Try as it might, the court cannot resist concluding that the idea that section 165(c)(3) somehow incorporates state criminal law into what is otherwise a federal taxing statute is a *non sequitur*. On close examination, the contrary view – that state law is controlling – appears to be a shibboleth[13] that, by constant repetition, has become embedded in the jurisprudence of section 165. And "as is generally true of legal fictions, there are hosts of problems with this often-reiterated, but little analyzed, proposition." *See Barnes v. United States*, 68 Fed. Cl. 492, 501 (2005).

---

[11]   For a small sampling of these cases, see, e.g., Alioto v. Comm'r of Internal Revenue, 699 F.3d 948, 955 (6th Cir. 2012); Estate of Meriano v. Comm'r of Internal Revenue, 142 F.3d 651, 658 (3d Cir. 1998); Bellis v. Comm'r of Internal Revenue, 540 F.2d 448, 449 (9th Cir. 1976); Stoltz v. United States, 410 F. Supp. 2d 734, 740-41 (S.D. Ind. 2006).

[12]   *See Matheson v. Comm'r of Internal Revenue*, 54 F.2d 537, 539 (2d Cir. 1931) (construing the term "casualty"); *Ambrose*, 106 Fed. Cl. at 159 (same); *Buist v. United States*, 164 F. Supp. 218, 220 (E.D.S.C. 1958) (same).

[13]   One is reminded of Dean Roscoe Pound's comments concerning the dangers of legal fictions:

> [F]ictions easily become starting points for legal reasoning. As they are not always readily distinguishable from legal doctrines generally, they are taken as premises from which to reason and are used as the basis for constructing and developing anomalous and unfortunate propositions. . . . It is because of such collateral consequences that fictions are most objectionable today.

3 Roscoe Pound, Jurisprudence 467 (1959).

For one thing, having the deductibility of a theft loss under section 165(c) turn on a specific state's criminal statutes runs counter to the interpretative rules generally applicable to the construction of federal taxing statutes. Those statutes are not immune from the fundamental principle that controls the construction of federal statutes more generally, *to wit*, that "[t]he plain meaning . . . should be conclusive." *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989); *see also Bob Jones Univ. v. Simon*, 416 U.S. 725, 732 n.6 (1974); *Braunstein v. Comm'r of Internal Revenue*, 374 U.S. 65, 71 (1963).[14] In conducting this interpretative task, courts construing federal tax statutes have been guided by several other principles of interpretation. One, a "fundamental canon of statutory construction," is that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979).[15] Another is that "[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Neder v. United States*, 527 U.S. 1, 21 (1999) (internal quotations omitted).[16] Lastly, yet another rule of interpretation potentially applicable here is that "[tax] deductions are strictly construed and allowed only 'as there is a clear provision therefor.'" *INDOPCO, Inc. v. Comm'r of Internal Revenue*, 503 U.S. 79, 84 (1992) (quoting *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934)). Yet, despite this canon, it has been observed that even if "not supported by express statutory language," a loss deduction under section 165 "can nonetheless be recognized if it is 'in harmony with the statute as an organic whole.'" *Centex Corp. v. United States*, 395 F.3d 1283, 1295 (Fed. Cir. 2005) (quoting *United States v. Foster Lumber Co.*, 429 U.S. 32, 42 (1976) (quoting *Lewyt Corp. v. Comm'r of Internal Revenue*, 349 U.S. 237, 240 (1955))).

As these rules of construction suggest, the interpretation of federal taxing statutes is marked by a degree of insularity, with Congress ordinarily being the one that defines what is income, what is deductible, etc. Within this rubric, the wholesale incorporation – via judicial

---

[14] *See also Xianli Zhang v. United States*, 640 F.3d 1358, 1364 (Fed. Cir. 2011), *cert. denied*, 132 S. Ct. 2375 (2012); *Electrolux Holdings, Inc. v. United States*, 491 F.3d 1327, 1330 (Fed. Cir. 2007).

[15] *Perrin*, to be sure, is not a federal tax case, but numerous cases apply its rule of construction in the latter context. *See, e.g.*, *Comm'r of Internal Revenue v. Neal*, 557 F.3d 1262, 1280 (11th Cir. 2009); *United States v. Kjellstrom*, 100 F.3d 482, 484 (7th Cir. 1996); *Sharp v. United States*, 14 F.3d 583, 587-88 (Fed. Cir. 1993); *Ambrose*, 106 Fed. Cl. at 159; *Vons Cos., Inc. v. United States*, 55 Fed. Cl. 709, 713 n.8 (2003); *see also City of Dall., Tex. v. FCC*, 118 F.3d 393, 396 n.4 (5th Cir. 1997).

[16] *See also United States v. Coplan*, 703 F.3d 46, 59 (2d Cir. 2012); *United States v. Mann*, 161 F.3d 840, 866 n.85 (5th Cir. 1998), *cert. denied*, 526 U.S. 1117 (1999); 2B Norman J. Singer, Sutherland Statutory Construction § 50.4 (7th ed. 2012) (noting the "utility to examine a federal statute with reference to the common law of the various states as it existed when the statute was enacted"); *see generally*, *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1168-69 & n.4 (Fed. Cir. 2011) (applying this rule in a non-tax case).

interpretation – of state law and, in particular, the laws of a particular state, is the rare exception, certainly not the rule. So held the Supreme Court in its seminal 1932 opinion in *Burnet v. Harmel*, 287 U.S. 103 (1932). There, in rejecting an argument that the capital gains treatment of sales proceeds was controlled by how Texas law treated the sale of oil and gas in place, the Court observed:

> Here we are concerned only with the meaning and application of a statute enacted by Congress, in the exercise of its plenary power under the Constitution, to tax income. The exertion of that power is not subject to state control. It is the will of Congress which controls, and the expression of its will in legislation, in the absence of language evidencing a different purpose, is to be interpreted to give a uniform application to a nation-wide scheme of taxation.

*Id.* at 110. The Court added that "[s]tate law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law." *Id.*; *see also Helvering v. Stuart*, 317 U.S. 154, 161 (1942); *United States v. Pelzer*, 312 U.S. 399, 402-03 (1941).[17]

Consistent with this approach, the implied incorporation of state law into Federal tax law has occurred almost exclusively in cases involving property interests. *See, e.g.*, *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985) ("[I]n the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property."); *Aquilino v. United States*, 363 U.S. 509, 512-13 (1960); *United States v. Bess*, 357 U.S. 51, 55-56 (1958); *Morgan v. Comm'r of Internal Revenue*, 309 U.S. 78, 82 (1940). This collection of cases hinges on the need to strike "a proper balance between the legitimate and traditional interest which the State has in creating and defining the property interest of its citizens, and the necessity for a uniform administration of the federal revenue statutes." *Aquilino*, 363 U.S. at 514; *see also Nat'l Bank of Commerce*, 472 U.S. at 722.[18] There is no such

---

[17] For several of the many cases applying this rule, *see Davis v. United States*, 961 F.2d 867, 879 (9th Cir. 1992), *cert. denied*, 506 U.S. 1050 (1993) (refusing to apply state law in allocating tax payments because it "raises the specter of a plethora of different rules and requirements governing IRS treatment of undesignated payments"); *Brown v. United States*, 890 F.2d 1329, 1337 (5th Cir. 1989) (refusing to apply state probate law in applying estate tax); *Isaacson, Rosenbaum, Spiegleman & Friedman, P.S. v. United States*, 221 Ct. Cl. 831, 832 (1979) (refusing to apply state law in determining what is reasonable compensation under section 162(a)(1) of the Code); *Capital Sav. & Loan Ass'n v. United States*, 607 F.2d 970, 977 (Ct. Cl. 1979) (refusing to apply state law in determining whether accounts were debt or equity for federal income tax purposes).

[18] Courts have likewise concluded that marital status and corporate existence are areas in which necessity requires incorporation of state law. *See Lee v. Comm'r of Internal Revenue*, 64 T.C. 552, 556 (1975), *aff'd*, 550 F.2d 1201, 1202 (9th Cir. 1977) (marital status); *O'Neill v. United States*, 410 F.2d 888, 896-99 (6th Cir. 1969) (corporate existence).

need to strike a balance here – no "necessary implication," to use the words of *Burnet* – because as several titles of the U.S. Code (*e.g.*, Titles 18 and 31) attest, the definition of crimes is certainly not the exclusive province of the states, even with respect to such traditional offenses as theft.  Given this, one would think that "the necessity for a uniform administration of the federal revenue statues," *Aquilino*, 363 U.S. at 514, would require courts to adopt a relatively uniform federal definition of the term "theft," as used in section 165(c)(3) – one that does not require a taxpayer to research the particulars of state criminal law, applicable at the time of the loss, before claiming such a deduction.

The key word in the statute – "theft" – has a long-standing and well-accepted meaning. Familiar lexicons mark this path.  Thus, Black's Law Dictionary defines that term as "[t]he fraudulent taking of corporeal personal property belonging to another, from his possession, or from the possession of some person holding the same for him, without his consent, with intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking."  Black's Law Dictionary 1647-48 (4th ed. 1951); *see also* Webster's New Int'l Dictionary 2618 (2d ed. 1948) (theft:  "the felonious taking and removing of personal property, with intent to deprive the rightful owner of it").  At least by the time the 1954 Code was enacted, it also was well-accepted that the definition of "theft" includes a crime in which one "obtains possession of property by lawful means and thereafter appropriates the property to the taker's own use."  Black's Law Dictionary 1648 (4th ed. 1951); *see also* Webster's New Int'l Dictionary 2618 (2d ed. 1948) (theft includes "misappropriation or wrongful use of personal property originally lawfully taken or received").  Definitions like these have formed the *ratio dicendi* in many cases.[19]  These definitions of "theft" are largely indistinguishable from that employed in the Model Penal Code, which defines a "theft" as occurring where a person "unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof."  Model Penal Code § 223.2(1); *see also id.* at § 223.3 (theft by deception).  This is relevant because the Model Code's provisions have often been employed in determining the

---

[19]  *See United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1243 (D.C. Cir. 2008), *cert. denied*, 129 S. Ct. 2377 (2009) (construing 18 U.S.C. § 1028A (aggravated identity theft)); *United States v. Juarez-Gonzalez*, 451 Fed. Appx. 387, 390 (5th Cir. 2011) (construing the Federal sentencing guidelines); *Meridian Citizens Mut. Ins. Co. v. Horton*, 2010 WL 1253084, at *5 (E.D. Ky. Mar. 25, 2010) (construing insurance policy); *Wegmans Food Mkts., Inc. v. MacArthur*, 2001 WL 34545897, at *4 (W.D.N.Y. July 13, 2001) (construing 11 U.S.C. § 523(a)(4)); *In re Stinson*, 2012 WL 359917, at *6 (Bankr. D. Mass. Feb. 2, 2012) (same); *In re Hunter*, 484 B.R. 721, 728 (Bankr. E.D. Tenn. 2012) (same); *State v. Nugent*, 154 Wash. App. 1053 (2010) (construing state statute); *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 476 (Mo. Ct. App. 2008) (construing insurance policy); *Mancine v. Unemployment Comp. Bd. of Review*, 947 A.2d 239, 240 (Pa. Commw. Ct. 2008) (construing theft policy in applying unemployment statute); *Jefferson Cnty. v. Kiser*, 876 P.2d 122, 123 (Colo. App. 1994) (construing state unemployment benefits statute); *see also United States v. Montejo*, 353 F. Supp. 2d 643, 654 (E.D. Va. 2005), *aff'd*, 442 F.3d 213 (4th Cir.), *cert. denied*, 549 U.S. 879 (2006); *Perlman v. Zell*, 938 F. Supp. 1327, 1347 (N.D. Ill. 1996).

scope of an offense referenced in a Federal statute.  *See, e.g.*, *Taylor v. United States*, 495 U.S. 575, 580, 598 n.8 (1990); *Hernandez-Mancilla v. INS*, 246 F.3d 1002, 1007 (7th Cir. 2001).

These well-accepted definitions of "theft" make reference here to state law unnecessary. Indeed, in determining whether particular conduct amounts to "theft" under other Federal statutes, the Supreme Court has eschewed applying an individual state's laws in favor of embracing a more uniform, common-law definition.  Take, for example, the recent case of *Gonzales v. Duenas-Alvarez*, 549 U.S. 184 (2007).  There, the Court construed the Immigration and Nationality Act (INA), 66 Stat. 163, *as amended*, 8 U.S.C. § 1101, *et seq.* (2000 ed. and Supp. IV), which lists a set of offenses on which convictions may lead to the removal of an alien from the United States.  Aggravated felonies comprise one such category, 8 U.S.C. § 1227(a)(2)(A)(iii), a category that includes a "theft offense . . . for which the term of imprisonment [is] at least one year."  8 U.S.C. § 1101(a)(43)(G).  In deciding whether "aiding and abetting" a theft is a "theft offense" under the INA, the Court, in *Duenas-Alvarez*, rejected a specific definition of "theft" derived from California law, in favor of a generic definition of that term.  *Duenas-Alvarez*, 549 U.S. at 189-90, 193-94.

In so holding, the Court relied, as had many lower courts,[20] upon *Taylor v. United States*, 495 U.S. 575 (1990).  In *Taylor*, the Court construed the term "burglary" as used in the Armed Career Criminal Act of 1984, Pub. L. No. 98-473, ch. 18, 98 Stat. 2185, which mandated lengthy prison sentences for certain repeat offenders.  As described by the Court in *Duenas-Alvarez*, *Taylor* "held that Congress meant its listed term 'burglary' to refer to a specific crime, *i.e.*, 'burglary' in 'the generic sense in which term is now used in the criminal codes of most States.'" *Duenas-Alvarez*, 549 U.S. at 186 (quoting *Taylor*, 495 U.S. at 598) (internal quotations omitted). The Court noted that, in *Taylor*, it had "held that a state conviction qualifies as a burglary conviction, 'regardless of' the 'exact [state] definition or label' as long as it has the 'basic elements' of 'generic' burglary, namely, 'unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime.'"  *Duenas-Alvarez*, 549 U.S. at 186 (quoting *Taylor*, 495 U.S. at 599).[21]

Applying the *Taylor* rationale, the Court in *Duenas-Alvarez* concluded that, in construing the INA's deportation provision, courts should apply, "as a generic definition of theft, the 'taking

---

[20]   *See, e.g.*, *Soliman v. Gonzales*, 419 F.3d 276, 284 (4th Cir. 2005); *Abimbola v. Ashcroft*, 378 F.3d 173, 176-177 (2d Cir. 2004), *cert. denied sub. nom.*, *Abimbola v. Gonzales*, 546 U.S. 1036 (2005); *Huerta-Guevara v. Ashcroft*, 321 F.3d 883, 886-888 (9th Cir. 2003); *Hernandez-Mancilla*, 246 F.3d at 1006, 1009; *Drakes v. Zimski*, 240 F.3d 246, 248-49 (3d Cir. 2001).

[21]   In *Duenas-Alvarez*, the Court observed that in *Taylor* it indicated that if a state statute "'define[d] burglary more broadly,'" the "Court's 'categorical approach' permits the sentencing court 'to go beyond the mere fact of conviction' in order to determine whether the earlier 'jury was actually required to find all the elements of generic burglary.'"  549 U.S. at 186-87 (quoting *Taylor*, 495 U.S. at 599, 602).

of property or an exercise of control over property without consent with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent.'" *Duenas-Alvarez*, 549 U.S. at 189 (quoting *Penuliar v. Gonzales*, 435 F.3d 961, 969 (9th Cir. 2006)).  Relying on a "comprehensive account of the law of all States and federal jurisdictions" provided by the Solicitor General, the Court found that, under this generic definition of theft, most jurisdictions had expressly abrogated the distinction between principals and aiders and abettors.  *Duenas-Alvarez*, 549 U.S. at 190.  It thereupon reasoned that "[s]ince criminal law now uniformly treats those who fall into [these] categories alike, 'the generic sense in which' the term 'theft' 'is now used in the criminal codes of most States,' covers such 'aiders and abettors' as well as principals."  *Id.* (quoting *Taylor*, 495 U.S. at 598).  Accordingly, the Court concluded that "the criminal activities of these aiders and abettors of a generic theft must themselves fall within the scope of the term 'theft' in the federal statute."  *Duenas-Alvarez*, 549 U.S. at 190.[22]

   *Duenas-Alvarez* and *Taylor* are merely the anterior of a phalanx of cases in which courts have refused to make the operation of federal statutes referring to crimes dependent on a specific state's law.  The latter rule has been applied not only to Federal criminal statutes, as in *Duenas-Alvarez* and *Taylor*, but also to civil statutes, particularly those that, like section 165(c)(3), explicitly make reference to specific crimes.  *See Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119-20 (1983) ("the application of federal legislation is nationwide and at times the federal programs would be impaired if state law were to control"); *United States v. Turley*, 352 U.S. 407, 411 (1957) ("in the absence of a plain indication of an intent to incorporate diverse state laws into a federal criminal statute, the meaning of the federal statute should not dependent on state law"); *Jerome v. United States*, 318 U.S. 101, 104 (1943) ("we must generally assume, in the absence of a plain indication to the contrary, that Congress when it enacts a statute is not making the application of the federal act dependent on state law").[23]  In general, cases of this ilk presume "that the application of federal legislation is nationwide" and should not vary from state to state.

---

   [22]  While the Court allowed for the possibility that a given conviction might be for conduct outside the generic definition, it found that this was not the case with respect to the case before it.  *Duenas-Alvarez*, 549 U.S. at 192-94.

   [23]  *See also Arriaga v. Mukasey*, 521 F.3d 219, 227 (2d Cir. 2008) ("absent contrary Congressional intent, federal statutes are not to be construed so that their application is dependent on state law"); *United States v. Tremble*, 933 F.2d 925, 929 (11th Cir.), *cert. denied*, 502 U.S. 928 (1991) (same in case construing 21 U.S.C. §§ 960(b)(2), 962(b)); *United States v. Palmer*, 871 F.2d 1202, 1205 (3d Cir.), *cert. denied*, 493 U.S. 890 (1989) ("[I]t is a well-established principle that where a federal criminal statute uses a common law term of established meaning without otherwise defining it, it is to be given its common law meaning, not its state law meaning."); *Wegmans Food Mkts.*, 2001 WL 34545897, at *4 (applying this rule in construing 11 U.S.C. § 523(a)(4)); *Perlman*, 938 F. Supp. at 1347-48 (same in case construing civil racketeering statute, 18 U.S.C. §§ 1962(b)-(d), and 18 U.S.C. §§ 2314-15); *United States v. BCCI Holdings (Luxembourg), S.A.*, 833 F. Supp. 32, 37 (D.D.C. 1993) (same in case construing civil recovery of forfeiture provision, 18 U.S.C. § 1963).

*Jerome*, 318 U.S. at 104; *see also Burnet*, 287 U.S. at 110.  They apply state law only when the statutory language commands otherwise.  Such, for example, is the case in the Travel Act, 18 U.S.C. § 1952, which makes it unlawful to travel in interstate commerce to promote, manage or carry on, *inter alia*, "extortion, bribery, or arson **in violation of the laws of the State in which committed** or of the United States."  18 U.S.C. §1952(b) (emphasis added).  Cases construing this statute have given effect to the highlighted language in applying state-law definitions of the crimes referenced.  *See Perrin*, 444 U.S. at 44-45 & nn.9-10 (dealing with "bribery"); *United States v. Nardello*, 393 U.S. 286, 293-96 (1969) (dealing with "extortion").  But, far from contradicting the general rule against incorporating state law into a federal statute, these cases reaffirm that rule by invoking the exception thereto that applies only when there is "plain indication of an intent to incorporate" such laws.  *Turley*, 352 U.S. at 411; *see also Burnet*, 287 U.S. at 110.  The statutes they construe, moreover, prove that when Congress intends to incorporate state law, as it did in the Travel Act, it is perfectly capable of doing so.  Of course, there is no comparable language in section 165(c)(3).

So, where a federal statute uses a common-law term of established meaning without otherwise defining it, the practice is to give that term its common meaning.  The court sees no reason why this rule ought not apply to section 165(c)(3).  Certainly, nothing in the statutory language, its legislative history,[24] or the relevant Treasury Regulations[25] suggests otherwise.  Indeed, by defining "theft" to include a variety of crimes (*e.g.*, embezzlement), Treas. Reg. § 1.165-8(d) initially follows the interpretational norms, recognizing that Congress intended that the term "theft" have content independent from state law and, more specifically, a meaning broader than what a given state might define as "theft."  But, why logically stop there?  Why, after defining the term "theft" to encompass a broader range of crimes, should we conclude that

---

[24]  Nothing in the legislative history suggests any reliance on state law.  *See* H.R. Rep. 99-841, at II-342-43 (1986); S. Rep. No. 99-313 (1986); H.R. Rep. No. 99-426, at 658 (1985); H.R. Rep. No. 83-2543 (1954); S. Rep. No. 83-1622, at 23, 198 (1954); H.R. Rep. No. 83-1337, at 21, A46 (1954); H.R. Rep. No. 64-1200 (1916); S. Rep. No. 64-793 (1916); H.R. Rep. No. 64-922 (1916).

[25]  In the near century since the original version of what would become section 165(c) was passed, the IRS has issued over a dozen regulations on this subject, none of which suggest, in the slightest, that state law should play a definitive role in determining the deductibility of a theft loss.  *See* Treas. Reg. § 1.165-8 (promulgated in 1960 – 25 Fed. Reg. 381, 387 (Jan. 16, 1960)); 26 C.F.R. § 39.23(e)-1 (1954); 26 C.F.R. § 29.23(e)-1 (1944 Cum. Supp.); 26 C.F.R. § 19.23(e)-1 (1940 Supp.); Treas. Reg. No. 101, Art. 23(e)-1 (1939); Treas. Reg. No. 94, Art. 23(e)-1 (1936); Treas. Reg. No. 86, Art. 23(e)-1 (1935); Treas. Reg. No. 77, Art. 171 (1933); Treas. Reg. No. 74, Art. 171 (1929); Treas. Reg. No. 69, Art. 141 (1926); Treas. Reg. No. 65, Art. 141 (1924); Treas. Reg. No. 62, Art. 141 (1922); Treas. Reg. No. 45, Art. 141 (1919 & Rev. 1924); Treas. Reg. No. 33, Art. 8, Pts. 80, 120 (1918).  For what it is worth, since 1960, the current regulations have included an example regarding the deductibility of a theft loss related to a "stolen" diamond brooch, without ever discussing whether the brooch was taken via an action that qualified as "theft" under a given state law.  Treas. Reg. § 1.165-8(f).

Congress intended that each of those individual crimes be viewed only through the prism of a particular state's laws?  Did Congress really intend Federal trial courts to preside over mini-trials applying state criminal laws – often dealing with complicated questions involving the elements or *mens rea* requirements of particular state crime – all to resolve the deductibility of a theft loss under Federal law?  And, if Congress intended to incorporate criminal law into this statue, why only state law, and not the plethora of Federal statutes that criminalize "thefts;"[26] various forms of larceny, embezzlement, fraud, and robbery;[27] as well as money laundering, wire fraud, and other conduct associated with such crimes?[28]  Can it be that when a conviction for theft is obtained under one of these Federal statutes, a taxpayer harmed by that conduct must still gauge the deductibility of his losses by hypothetically applying a state criminal law?[29]  Of course not.

---

[26]  *See, e.g.*, 18 U.S.C. §§ 655 (theft by bank examiner); 656 (theft, embezzlement, or misapplication by bank officer or employee); 664 (theft or embezzlement from employee benefit plan); 665 (theft or embezzlement from employment and training funds); 666 (theft concerning programs receiving Federal funds); 667 (theft of livestock); 668 (theft of major artwork); 669 (theft or embezzlement in connection with health care); 670 (theft of medical products); 1028A (aggravated identity theft); 1163 (embezzlement and theft from Indian tribal organizations); 1167 (theft from gaming establishments on Indian lands); 1708 (theft or receipt of stolen mail matter); 1710 (theft of newspapers); 1832 (theft of trade secrets).

[27]  *See, e.g.*, 10 U.S.C. §§ 921 (military code of justice – larceny); 922 (military code of justice – robbery); 15 U.S.C. § 80a-36 (larceny and embezzlement of moneys, funds, or other property of a registered investment company); 18 U.S.C. §§ 1661 (pirates committing robbery ashore); 2113 (bank robbery and incidental crimes); 2118 (robberies and burglaries involving controlled substances); 2119 (car-jacking).

[28]  *See, e.g.*, 18 U.S.C. §§ 1343 (wire fraud); 1957 (money laundering); 17 C.F.R. § 240.10b-5 (securities fraud).

[29]  The Tax Court confronted a situation like this in *Brown Corp. of Ionia, Inc. v. Commissioner of Internal Revenue*, 45 T.C.M. (CCH) 200 (1982), in which case the individual causing the taxpayer's loss had been convicted of six counts of securities fraud under 18 U.S.C. §§ 1014, 2314.  In analyzing the deduction, the Tax Court first slightly altered the *Edwards* standard, indicating that whether a loss from theft has occurred under section 165 is "largely dependent on the provisions of State criminal law," but adding that "a Federal criminal statute [may] provide[] the requisite criminality so that a taking of a taxpayer's property may appropriately be considered a theft under section 165."  *Brown*, 45 T.C.M. (CCH) at 213. Despite the latter statement, the Tax Court proceeded to conclude that the actions in question did not amount to a theft under  Michigan law, citing as support for that finding cases involving taxpayers in Kentucky and New York.  *Id.*; *see also Nichols v. Comm'r of Internal Revenue*, 43 T.C. 842, 884-85 (1965) (holding that fraud was a "theft" for purposes of section 165 under Federal and Florida law).  Several commentators have expressed concern that the victims of securities fraud crimes prosecuted under Federal law might not qualify for deductions under section 165(c)(3) because their losses would not be viewed as resulting from thefts under state law.  *See* Brian Elzweig & Valerie Chambers, "Modernizing the Theft Loss Deduction for

None of this, indeed, makes the least bit sense.  Yet, such points have been glossed over in cases that have made the deductibility of theft losses depend upon the law of the state where the loss was "sustained."[30]

Nor, unfortunately, are these the only anomalies spawned by this *ipse dixit* incorporation of state law.  In fact, in case after case dealing with section 165(c)(3) and its predecessors, courts confronted with facts that do not comfortably fit within the state-law precedents have simply sidestepped those cases.  That has happened where state law provided somewhat idiosyncratic limits on what was considered theft – for example, in cases involving a wife claiming a theft by her husband, or a parent claiming a theft by a child.[31]  It has also happened when the theft allegedly giving rise to the loss has occurred in a foreign country, with at least some courts being understandably hesitant to wade into the criminal codes of countries like Canada, Thailand, or communist Romania.[32]  And, it has even happened where courts – and the IRS – have simply

——————————————

Victims of Securities Frauds and Ponzi Schemes," 30 No. 9 Banking & Fin. Servs. Pol'y Rep. 1, 7 (Sept. 2011).

[30]  Courts that have selected among competing state laws based upon where the loss is "sustained" are, of course, applying a fiction on several levels.  That is certainly the case with an interstate fraud that not only would likely be prosecuted under Federal law, but for which the venue of the prosecution would be selected under rules and statutes that only sometimes focus on where the fraud crime is "committed."  *See, e.g.*, U.S. Const. art. III, § 2, cl. 3; Fed. R. Crim. P. 18; 18 U.S.C. § 1956(i).

[31]  *See Bagur v. Comm'r of Internal Revenue*, 603 F.2d 491, 501-03 (5th Cir. 1979) (Wisdom, J.) (holding, for federal tax purposes, that it was possible that a husband committed a theft against a wife-taxpayer despite the "impossibility of treating a husband as a thief of community assets in Louisiana, by virtue of his powers as head and master of the community"); *Earle v. Comm'r of Internal Revenue*, 72 F.2d 366, 366 (2d Cir. 1934) (holding, for federal tax purposes, that a child had committed a theft against a parent when he took securities from a safety deposit box and used them as collateral for a loan, based on common law rather than New York law).

[32]  *See Farcasanu v. Comm'r of Internal Revenue*, 436 F.2d 146, 149-50 (D.C. Cir. 1970) (basing deductibility on the existence of criminal intent, without consideration of Romanian law); *Martin v. Comm'r of Internal Revenue*, 2012 WL 6698718, at *3-4 (U.S. Tax. Ct. Dec. 26, 2012) (refusing to apply Thai law and holding that the taxpayer was not entitled to a theft loss deduction); *Enrick v. Comm'r of Internal Revenue*, 18 T.C.M. (CCH) 1136, 1139 (1959) (refusing to take judicial notice of Canadian theft statutes and denying taxpayer's theft loss deduction); *but see First Chi. Corp. & Affiliated Corps. v. Comm'r of Internal Revenue*, 69 T.C.M. (CCH) 2089, 2097-99 (1995) (applying Brazilian criminal law and holding that the taxpayer was entitled to a theft loss deduction); *Williams v. Comm'r of Internal Revenue*, 49 T.C.M. (CCH) 1324, 1334 (1985), *aff'd*, 786 F.2d 1170 (8th Cir. 1986) (noting, without any

concluded that applying some limiting principle of state criminal law (perhaps a strict *mens rea* requirement) would lead to a harsh or nonsensical result.[33]  Finally, not to be overlooked are deduction cases that cite, in holding that a given loss results *vel non* from a "theft" "sustained" in one state, cases involving "theft" losses sustained in other states, without any consideration as to whether the laws in the respective jurisdictions were analogous.[34]  Like signs warning of trouble ahead, this string of anomalies and asymmetries strongly suggests that some courts have been led up the garden path in holding that section 165(c)(3) incorporates state criminal laws.  Faced with the same fork in the road, and seeing many brambles lying ahead, this court chooses not to bound down this same *primula* path.

But what of *Edwards*, the Fifth Circuit case from which these state-law-incorporating decisions supposedly sprang?  Well, as is often proves true of shibboleths, there are serious reasons to doubt whether the Fifth Circuit ever intended that section 165(c)(3) would be construed in the way subsequent decisions have held.  In *Edwards*, the taxpayer was from Georgia and claimed a theft loss under section 23(e)(3) of the 1939 Code, asserting that a third

---

specific references to Costa Rican law, that the taxpayers "have not proven that any theft was committed under Costa Rican law").

[33]  *See Bagur*, 603 F.2d at 502 (refusing to apply Louisiana law); Rev. Proc. 2009-20, 2009-14 I.R.B. 749 (issued simultaneously with Rev. Rul. 2009-9, 2009-14 I.R.B. 735, providing a safe harbor under which certain investors in purported Ponzi schemes may treat a loss as a theft loss deduction when certain conditions are met); *see also* Rev. Proc. 2011-58, 2011-50 I.R.B. 849 (modifying Rev. Proc. 2009-20 to permit taxpayers to invoke safe harbor even if leader of Ponzi scheme had died before being charged); Rev. Rul. 72-112, 1972-1 C.B. 60 (holding that extortion may support a theft loss deduction despite the fact that the taking of the taxpayer's property did not amount to the statutory crime of theft under local law, because the extortion was "illegal under the law of the State where it occurred and the taking was done with criminal intent").

[34]  *See, e.g.*, *Halata v. Comm'r of Internal Revenue*, 104 T.C.M. (CCH) 804 (2012) (granting a theft loss deduction pursuant to Texas law and citing as support a case not applying Texas law); *Grothues v. Comm'r of Internal Revenue*, 84 T.C.M. (CCH) 561, 568-69 (2002) (denying a theft loss deduction pursuant to Texas law and citing a case applying California law); *Krause v. Comm'r of Internal Revenue*, 61 T.C.M. (CCH) 1670, 1675 (1991) (granting a theft loss deduction pursuant to California law and citing as support a case not applying California law); *West v. Comm'r of Internal Revenue*, 88 T.C. 152, 163 (1987) (denying a theft loss deduction pursuant to Utah law and citing as support a case not applying Utah law and a case applying Florida and federal laws); *Nichols v. Comm'r of Internal Revenue*, 43 T.C. 842, 884-85 (1965) (granting a theft loss deduction pursuant to Florida and federal laws and citing as support a case applying California law); *Eby v. Comm'r of Internal Revenue*, 22 T.C.M. (CCH) 1034, 1037-39 (1963) (denying a theft loss deduction pursuant to Pennsylvania law and citing as support a case applying Missouri law).

party (also in Georgia) obtained funds from him under the false pretense that it would be bet on horses, and instead embezzled the money. *Edwards*, 232 F.2d at 108, 110 & n.3. The government argued, *inter alia*, that the loss of funds in this fashion was from "swindling," not theft, and thus not covered by the statute. *Id.* at 110. The Fifth Circuit soundly rejected this claim. It began by observing that "the word 'theft' is not like 'larceny,' a technical word of art with a narrowly defined meaning but is, on the contrary, a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile." *Id.* In support of this proposition, the court not only cited cases from Missouri and California, but also quoted the definition of "theft" found in Webster's New International Dictionary and Bouvier's Law Dictionary, *id.* at 110 n.4 – references that would be odd, if not inexplicable, if the deductibility of the taxpayer's loss truly depended only upon Georgia law. The Fifth Circuit, of course, went on famously to state that whether a loss from theft is deductible "depends upon the law of the jurisdiction where it was sustained," but it hastened to add, in language usually overlooked, "that the exact nature of the crime, whether larceny or embezzlement, of obtaining money under false pretenses, swindling or other wrongful deprivations of the property of another, is of little importance so long as it amounts to theft." *Id.* at 110-11. In the end, the Fifth Circuit affirmed the district court's decision allowing the deduction – but, without ever citing, let alone discussing, any provisions of Georgia law. *Id.* at 111.

   In the court's view, a closer reading of *Edwards* brings into question what the Fifth Circuit felt was the proper role of state law in determining the deductibility of a theft loss. Did it really intend for that issue to be controlled by state law? Or did it intend, rather, for courts to rely upon the plain meaning and common law understanding of the term "theft," as the Fifth Circuit itself did in citing the dictionary definitions of that term and decisions from states other than Georgia? The latter references suggest that, in describing "theft" as a word of "general and broad connotation," the court recognized that state laws might play a limited role in helping to define that "connotation," but not be the barometer for determining what is deductible.[35] That, mind you, is how the Fifth Circuit itself has read *Edwards*. Twenty-three years after *Edwards* was decided, Judge John Minor Wisdom, writing on behalf of a unanimous panel in *Bagur*,

---

   [35] This is the approach taken by courts construing the former version of section 104(a)(2) of the Code, which excluded from income damages "received . . . on account of personal injuries." 26 U.S.C. § 104(a)(2) (1989). Originally, several courts, including the Ninth Circuit, held that state law determined whether particular damages were received on account of a "personal injuries." Ultimately, though, the Supreme Court decided that the question of whether particular damages were on account of "personal injuries" required the courts to apply a uniform Federal definition of that phrase based upon "common law tort law concepts." *See, e.g.*, *United States v. Burke*, 504 U.S. 229, 234-37 (1992) (quoting *Threlkeld v. Comm'r of Internal Revenue*, 87 T.C. 1294, 1305(1986)); *see also Francisco v. United States*, 267 F.3d 303, 307-08 (3d Cir. 2001); *see generally* William A. Stahr, "What Effect Should State Law Have in Defining 'Personal Injury' Damages for Purposes of I.R.C. Section 104(a)(2) Exclusion?," 29 San Diego L. Rev. 299 (1992).

allowed a wife to deduct a theft loss for property stolen by her husband, despite the "impossibility of treating a husband as a thief of community assets in Louisiana, by virtue of his powers as head and master of the community." 603 F.2d at 502. Rejecting the government's heavy reliance on *Edwards*, Judge Wisdom characterized the state-law rule as merely a "rule of convenience," adding that "[t]he issue before us now . . . is not whether the taxpayer's husband should be punished as a thief under state law but whether the taxpayer should be allowed a tax loss as the victim of a theft under the federal tax law." *Id.* The concurring opinion in *Bagur*, written by Judge Charles Clark, further emphasized that "[a]s Judge Wisdom points out, the law of theft is discrete for federal tax and State criminal law purposes," adding that "[b]y the same reasoning process, I would insist that the substance of reality mandates that this federal harassment merely to enforce the technical form of State civil law must stop forthwith." *Id.* (Clark, J., concurring).

While they are still a minority, a respectable number of cases decided both before and after *Edwards* reflect the same practical approach that was employed by Judge Wisdom in *Bagur* – one that relies upon the common law meaning of the term "theft," informed indirectly by state law to be sure, but not dependent upon a taxpayer proving that an alleged crime met all the elements of a particular state criminal statute.[36] In the court's view, this approach makes

---

[36] *See, e.g.*, *Krahmer v. United States*, 810 F.2d 1145, 1147 (Fed. Cir. 1987), *aff'g in part, rev'g in part*, 9 Cl. Ct. 49 (1985) (denying theft loss deductions without discussing state law); *Elliot v. Comm'r of Internal Revenue*, 40 T.C. 304, 311 (1963) (without discussing state law, holding that petitioner "sustained a theft loss"); *Ungar v. Comm'r of Internal Revenue*, 18 T.C. 688, 689 (1952), *aff'd*, 204 F.2d 322 (2d Cir. 1953) (without discussing state law, denying theft loss for jewelry and bonds taken by wife); *Johnson v. Comm'r of Internal Revenue*, 81 T.C.M. (CCH) 1538, 1540 (2001) (quoting *Edwards* for the proposition that theft "covers 'any criminal appropriation of another's property to the use of the taker'"); *Norris v. Comm'r of Internal Revenue*, 51 T.C.M. (CCH) 852, 859 (1986) (without discussing state law, holding that burglary of coins occurred and allowing theft loss deduction for same); *Doud v. Comm'r of Internal Revenue*, 43 T.C.M. (CCH) 916, 918-19 (1982) (without discussing state law, allowing deduction for theft of stamps); *Wilson v. Comm'r of Internal Revenue*, 43 T.C.M. (CCH) 699, 700 (1982) (without discussing state law, allowing deduction for theft of necklace); *Schmidt v. Comm'r of Internal Revenue*, 41 T.C.M. (CCH) 793, 797 (1981) (holding that a theft did not occur because a husband's actions did not amount to the "equivalence of a theft" even though "the allowance of a theft loss deduction may be justified to balance the hardship of imposing an income tax on income never received"); *Bodine v. Comm'r of Internal Revenue*, 37 T.C. (CCH) 1411, 1414 (1978) (without discussing state law, allowing deduction for theft of typewriter, radio, and stereo); *Pharr v. Comm'r of Internal Revenue*, 30 T.C.M. (CCH) 118, 118 (1971) (without discussing state law, allowing deduction for items stolen in burglary); *Clark v. Comm'r of Internal Revenue*, 28 T.C.M. (CCH) 1260, 1263-64 (1969) (without discussing state law, allowing theft deduction for loss of cash); *Buck v. Comm'r of Internal Revenue*, 26 T.C.M. (CCH) 147, 149 (1967) ("[N]o 'theft' has been proved. The word 'theft' connotes larceny, embezzlement, extortion, or some related criminal offense, and on this record we cannot find any criminality on the part of those who dealt with petitioner in the transaction before us."); *Cegielski*

---

eminent sense as it not only accords with the language of the statute and the normal rules of construction applied in interpreting tax statutes, but avoids the anomalies that result if a different approach is taken.

Now, all this would be for naught if either the Federal Circuit, or the Court of Claims before it, had cemented the state-law approach into this circuit's jurisprudence.  *See Griffin v. United States*, 85 Fed. Cl. 179, 186 (2008), *aff'd*, 590 F.3d 1291 (Fed. Cir. 2009) (discussing the impact of binding precedent).  Fortunately, this is not the case.  Research, indeed, reveals only one case in which one of those courts, the Federal Circuit, considered the deductibility of an alleged "theft" loss under section 165(c)(3) – doing so, as it turns out, without the slightest mention of state law.

In that case, *Krahmer v. United States*, 9 Cl. Ct. 49 (1985), the taxpayer claimed a theft loss based on the differences between the prices he paid for two oil paintings (one purported to be painted by W.M. Chase and the other by Nicolas Poussin) and their actual fair market values when he ascertained the artists were not as represented.  *Id.* at 51-52.  This court (Judge Philip R. Miller) held that the taxpayer could deduct the loss attributable to the Chase painting, which had a forged signature, finding that "anyone who sustained a loss on purchase in the belief that the painting was by William Merritt Chase was the victim of a theft by false pretenses or swindle." *Id.* at 52.  In reaching this conclusion, Judge Miller quoted from *Edwards* – not the part referring to the "law of the jurisdiction," but rather the portion indicating that the term "theft" is not "a technical word of [a]rt" – and relied upon opinions from courts around the country.  *Id.*  Judge Miller, however, held that no deduction could be attributed to the "Poussin" painting, finding that the curator who had sold the taxpayer that painting had simply made an error in attributing the painting to the wrong artist.  *Id.* at 55-57.  The court concluded that the curator had not "himself defrauded plaintiff by knowingly and intentionally misattributing the painting to Nicolas Poussin."  *Id.* at 53.

---

v. Comm'r of Internal Revenue*, 27 T.C.M. (CCH) 821, 822 & n.2 (1968) (citing *Edwards*, 232 F.2d at 110) ("Viewing 'theft' broadly and in a manner favorable to petitioners, we must conclude that the record before us presents no evidence of any criminal appropriation or loss."); *Jungert v. Comm'r of Internal Revenue*, 27 T.C.M. (CCH) 555, 557-58 (1968) (finding a "theft by a person or persons unknown," but not discussing or applying state law or procedure other than to mention a warrant sworn out by petitioner stating that "persons unknown had . . . 'willfully, unlawfully, intentionally and feloniously committed the crime of grand larceny'"); *Raberge v. Comm'r of Internal Revenue*, 20 T.C.M. (CCH) 1490, 1490 (1961) (without discussing state law, holding that a theft occurred when trees and timber were removed without authority by "unknown persons," finding that the theft was "in the nature of larceny"); *Appeal of Simons*, 1 B.T.A. 351, 353-54 (1925) (without discussing state law, allowing certain theft loss deductions and denying others).

On appeal, the Federal Circuit reversed the trial court's decision as to the loss attributable to painting with the forged signature (Chase), and affirmed its ruling with respect to the misattributed painting (Poussin). *Krahmer*, 810 F.2d at 1148. It held that this court had erred to the extent that it found that a deductible loss could be predicated solely on the forged signature, without proof that "the seller defrauded [the taxpayer] by knowingly and intentionally misattributing the painting to the artist." *Id.* at 1147. The circuit court held that the taxpayer had failed to provide the requisite proof of fraud as to both the Chase and Poussin paintings, affirming the lower court's findings in this regard as to the latter painting. *Id.* At no point in its opinion did the Federal Circuit refer to state law – indeed, the statements of fact in both opinions fail so much as to mention the state where the transactions occurred. Plainly, then, neither opinion relied upon state law in concluding that the deductions in question were not authorized. Instead,  the courts relied upon the stated requirements of the statute and common law concepts, primarily distinguishing between the sale of property based upon a fraud as opposed to a simple mistake.

In sum, based on the foregoing, the court rejects the notion that the deductibility of plaintiffs' losses hinges on the specific provisions of either Ohio or California criminal law. It concludes, instead, that the term "theft" in section 165(c)(3) means the fraudulent taking of property belonging to another, from his possession, or from the possession of some person holding the same for him, without his consent, with the intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking. *See* Black's Law Dictionary 1647-48 (4th ed. 1951); Webster's New Int'l Dictionary 2618 (2d ed. 1948); *see also Duenas-Alvarez*, 549 U.S. at 189 (quoting *Penuliar v. Gonzales*, 435 F.3d 961, 969 (9th Cir. 2006)) (theft is the "taking of property or an exercise of control over property without consent with the criminal intent to deprive the owner of rights and benefits of ownership . . . ."). This term also includes one who obtains possession of property by lawful means and thereafter appropriates the property. Black's Law Dictionary 1648 (4th ed. 1951).

## III.

Within this framework, to determine whether plaintiffs are entitled to the theft loss deduction they claim under section 165(c)(3) of the Code, the court must answer four subsidiary questions:  (i) whether the conduct of the CPR officials in question constituted a theft within the meaning of that provision; (ii) whether the theft loss, if any, was discovered by plaintiffs in 2004, the year the deduction is claimed; (iii) whether, in 2004, there was still a reasonable prospect of recovering the funds lost; and (iv) the amount of the theft loss, if any. *See* 26 U.S.C. § 165(c)(3), (e); Treas. Reg. § 1.165-1(d)(2)(i); *see also Johnson v. United States*, 80 Fed. Cl. 96, 116-17 (2008). A careful review of the briefs on the pending cross-motions for summary judgment indicates that underlying each of these questions are a host of genuine issues of material fact that preclude this court from entering summary judgment as to any of these issues. Rather, it would appear that these questions – involving that nature of CPR's conduct, what plaintiffs knew and when, and the quantum of the deduction, if any, that should be allowed – are suitable only for resolution at trial. *Cf. McGee v. United States*, 2012 WL 4756366 (S.D. Ohio Oct. 4, 2012).

Each of these issues must be viewed through the prism of the court's analysis above, regarding the fundamental nature of the theft loss deduction authorized by section 165(c)(3).[37]

Based upon the foregoing, defendant's motion for summary judgment is hereby **DENIED** and plaintiffs' cross-motion for summary judgment is hereby **DENIED**.  On or before March 29, 2013, the parties shall file a joint status report proposing a trial date and trial location, estimating the length of trial, and proposing a schedule for pretrial filings.  Before filing this report, the parties shall have at least one serious discussion regarding settling this matter.

**IT IS SO ORDERED.**

s/Francis M. Allegra
Francis M. Allegra
Judge

---

[37] The court, of course, cannot resolve plaintiffs' entitlement to loss carryback deductions for 2001, 2002, and 2003 until it resolves plaintiffs' entitlement to the loss deduction for 2004, from whence these carrybacks spring.  *See* 26 U.S.C. § 172(a), (b)(1)(F); *see also Halata*, 104 T.C.M. (CCH) at 804.